In re **SPECTRUM INFORMATION TECHNOLOGIES, INC., Dealer Services Business Systems, Inc. and Spectrum Cellular Corporation, Debtors.**

Bankruptcy Nos. 195–10690–260, 195–10692–260 and 195–10693–260.

United States Bankruptcy Court, E.D. New York.

Jan. 3, 1996.

Cleary Gottlieb Steen & Hamilton by George Weisz, New York City, for debtors.

Amon & Sabatini by John S. McGowan, New York City, for Joseph Musacchio and John Silver.

Brown & Wood by Andrew J. Maloney, New York City, for Peter Caserta.

Jeffrey M. Rosenblum, P.C., Great Neck, New York, for Edward Maskaly and John Marchione.

Mayer Brown & Platt by Raniero D'Aversa, Jr., New York City, for Creditors Committee.

A. Werner Pleus, Plandome, New York, pro se.

*DECISION ON DEBTORS' MOTION FOR AN ORDER APPROVING DEBTORS' REJECTION OF CERTAIN AGREEMENTS*

CONRAD B. DUBERSTEIN, Chief Judge.

Spectrum Information Technologies, Inc. ("Spectrum") together with two of its wholly owned subsidiaries (collectively the "Debtors" and hereinafter referred to interchangeably as "Spectrum" and "Debtors") as debtors and debtors-in-possession, move for an order of this Court pursuant to section 365 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 6006[1] approving their rejection of certain Employment and Separation Agreements. Spectrum contends that the subject Employment and Separation Agreements are executory contracts within the meaning of section 365[2] and may be properly rejected as in the best interests of the Debtors, their creditors and estates. Certain parties to the Agreements in issue object to Spectrum's motion on the ground that the Agreements are not executory and, therefore, not capable of rejection. Upon conclusion of the hearing on the motion, this matter was taken under advisement. For the reasons set forth below, Spectrum's motion is denied.

### FACTS

Spectrum is a publicly held corporation that is the corporate parent of the other two Debtors, Dealer Services Business Systems, Inc. d/b/a Data One, ("Data One") and Spectrum Cellular Corporation, ("Cellular"). Spectrum is engaged, through its subsidiaries, in the business and development of wireless data transmission technology and in other technology-related business activities. Substantial financial losses and expenses incurred in the defense of securities-related investigations and litigation necessitated the Debtors filing petitions for relief under chapter 11 on January 26, 1995.[3]

As part of Spectrum's endeavors to reorganize and refine its operations to, among other things, improve profitability, Spectrum's

---

1. Unless otherwise indicated, subsequent chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

2. Section 365(a) provides, in pertinent part: "[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 1107(a) provides the general grant to a debtor-in-possession of "all the rights ... of a trustee serving in a case under this chapter," thereby authorizing a debtor-in-possession to exercise the trustee's election to assume or reject. 11 U.S.C. § 1107(a).

3. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to orders of this Court.

management determined that the continued employment of certain employees providing services that its management deemed nonessential, was neither necessary nor in the best interests of the Debtors, their estates and creditors, and chose to terminate their employment.

*The Employment Agreements*

John Marchione ("Marchione") was the president of Computers Unlimited of Wisconsin, Inc. d/b/a Computer Bay ("Computer Bay"), formerly an administratively consolidated debtor-subsidiary of Spectrum which filed a petition for relief in this Court on January 26, 1995 at the same time that the aforementioned Debtors filed their petitions. Computer Bay was converted from chapter 11 to chapter 7 by order dated May 25, 1995. As a result of his termination, Marchione has separately moved this Court for allowance and payment of what he characterizes as "severance pay" as a priority administrative expense under section 503(b)(1)(A). *See* note 5 *infra.* In light of that pending motion, the parties have stipulated that the issue of whether Marchione's Employment Agreement is executory and rejectable shall be severed from the instant rejection motion affecting other former employees and be addressed and determined in the context of Marchione's motion.

In addition, Spectrum seeks authorization to reject the Employment Agreement between Spectrum and its former chief executive officer, Edward Maskaly ("Maskaly"), (the "Employment Agreement") pursuant to which Maskaly became entitled to six months salary if his employment was terminated without just cause or if Spectrum hired a new chief executive officer to replace him. Maskaly was terminated on December 31, 1994, almost one month prior to the filing of the Debtors' bankruptcy petitions, and a new chief executive officer was hired by Spectrum as of January 1, 1995. Under the Employment Agreement, Maskaly has continued obligations to comply with confidentiality and non-interference clauses.

*The Separation Agreements*

Lastly, Spectrum seeks authorization to reject the Separation Agreements between Spectrum and the following former officers, directors and employees of Spectrum: (1) Peter Caserta ("Caserta"); (2) A. Werner Pleus ("Pleus"); (3) Joseph Musacchio ("Musacchio"); (4) John Silver ("Silver"); and (5) Dana Verrill ("Verrill"), (collectively the "former employees" and the "Separation Agreements").

Spectrum and the foregoing former employees agreed to terminate their employment relationships and, prior to the Debtors' January 26, 1995 filing, entered into the Separation Agreements which outlined the parties' rights and responsibilities. These Agreements included *inter alia,* an award of termination payments, modification of pre-existing stock options, in some cases automobile allowances, and provided for some of the former employees to furnish consulting services for which fees would be paid by Spectrum. The former employees agreed to comply with confidentiality, non-interference and noncompete provisions (the "restrictive covenants").[4]

Spectrum maintains that the Employment and Separation Agreements continue to impose obligations on all parties, are executory contracts which fall within the scope of section 365(a) and are capable of properly being rejected as in the best interests of the Debtors, their estates and creditors. In opposition to the instant motion, the former employees assert *inter alia,* that inasmuch as there are no material obligations remaining on either side, the Employment and Separation Agreements are not "executory" and, therefore, not rejectable under section 365(a).

*DISCUSSION*

■ Section 365(a) governs the assumption or rejection of "any executory contract or unexpired lease" of the debtor. 11 U.S.C. § 365(a). Approval of a debtor's assumption or rejection of an executory contract is contingent upon the exercise of the debtor's

---

**4.** In examining the subject Agreements for purposes of an executoriness analysis, this Court applies similar considerations to confidentiality, public statement and non-interference provisions as it does to non-compete covenants.

business judgment. *See, e.g., N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513, 523, 104 S.Ct. 1188, 1194–1195, 79 L.Ed.2d 482 (1984); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),* 4 F.3d 1095, 1098–99 (2d Cir.1993), *cert. dismissed* —— U.S. ——, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994); *Control Data Corp. v. Zelman (In re Minges),* 602 F.2d 38, 42 (2d Cir.1979); *In re Child World, Inc.,* 142 B.R. 87, 89 (Bankr.S.D.N.Y.1992).

■ The significance of rejection of an unassumed executory contract is that it not only relieves the estate of onerous and burdensome future obligations but it also gives rise to a prepetition general unsecured claim for damages rather than an administrative expense priority,[5] with the concomitant possibility of payment of such general unsecured claim "in little tiny Bankruptcy Dollars which may be worth only ten cents in U.S. Dollars." *In re Child World,* 147 B.R. 847, 850 (Bankr. S.D.N.Y.1992) (citing Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227, 253 (1989)).

A central issue thus becomes whether the contract is "executory" for purposes of assumption or rejection under section 365.[6] However, the term "executory contract" is not defined in the Bankruptcy Code and the law remains unsettled over the proper interpretation of the word "executory." *See Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* cited in note 6 *infra,* ("[I]n no area of bankruptcy 'has the law become more psy-

chedelic than in the one titled "executory contracts." ' ") (citing Westbrook, 74 Minn. L.Rev. at 288).

The legislative history to section 365 indicates that "though there is no precise definition of what contracts are executory, it generally includes contracts on which performance is due to some extent on both sides." H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5844, 6303. However, as previously noted by this Court, "[t]he problem with the above stated definition is if it is to be stretched, it becomes evident that all contracts could be considered executory." *In re Leonard Bluman,* 125 B.R. 359, 361 (Bankr.E.D.N.Y.1991) (citations omitted); *In re Leibinger–Roberts, Inc.,* 105 B.R. 208, 211 (Bankr.E.D.N.Y. 1989). Rarely does an agreement *not* involve unperformed obligations on both sides. *Id.*

Most reported cases rely upon the definition enunciated by Professor Vern Countryman in what may be the most cited law review article on any bankruptcy subject, to wit, Vern Countryman, *Executory Contracts in Bankruptcy, Part I,* 57 Minn.L.Rev. 439 (1973). Professor Countryman's definition provides that an executory contract is one "under which the obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the perfor-

---

5. Section 365(g)(1) sets the consequences of rejection and provides that (1) rejection constitutes a breach and (2) this breach is deemed to have occurred prior to the filing of the petition. *See* 11 U.S.C. § 365(g)(1); 11 U.S.C. § 502(g). An exception to the prepetition status of a claim arises if the claim relates to a post-petition actual and necessary cost of administration. In that event, such claim is given priority under section 503 and is paid in full before the general unsecured claims are paid. *See* 11 U.S.C. § 503(b)(1).

6. *But see Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 708 (Bankr.S.D.N.Y. 1992) (abolishing the "executoriness" requirement and holding that "[a] bankruptcy estate is only liable administratively on a contract ... if

that liability is expressly assumed.... Rejection's effect is to give rise to a remedy in the non-debtor party for breach of the rejected contract, typically a right to money damages assertable as a general unsecured claim.... There should be no threshold requirement that a contract be 'executory' as a prerequisite to assumption or rejection.") (quoting Jay Lawrence Westbrook, *A Functional Analysis of Executory Contracts,* 74 Minn.L.Rev. 227, 335 (1989)); Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection,* 59 U.Colo.L.Rev. 845, 890 (1988) (dismissing the question of what is an executory contract for purposes of section 365 as meaningless and reasoning that the definition of "executory contract" matters only when the assumption of the contract is at issue inasmuch as rejection simply places the non-debtor party in the same position as other holders of claims).

mance of the other." Countryman, 57 Minn. L.Rev. at 460.

Under the Countryman definition, therefore, those contracts where one party has completed performance are excluded from the ambit of section 365. *See In re Chateaugay Corp.*, 102 B.R. 335, 345 (Bankr. S.D.N.Y.1989) (citing *In re J.M. Fields Inc.*, 22 B.R. 861, 864 (Bankr.S.D.N.Y.1982)). Similarly, those contracts where the only remaining obligation is the payment of money are also excluded. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 6303–04 ("A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contact is no longer executory."); *In re Chateaugay*, 102 B.R. at 345 (citations omitted).

The significant date for determining whether a contract is executory is initially at the time when the bankruptcy petition was filed. *Collingwood Grain, Inc. v. Coast Trading Co., Inc. (In re Coast Trading Co.)*, 744 F.2d 686, 692 (9th Cir.1984). However, "events after the filing ... may cause the contract to be regarded as not executory when the motion to assume or reject was made, such as contracts which expired post-petition by their own terms after the date of [filing] but before the motion was heard." *In re Child World*, 147 B.R. at 851–52; *Camp v. Nat'l Union Fire Ins. Co. of Pittsburgh (In re Government Securities Corp.)*, 101 B.R. 343, 349 (Bankr.S.D.Fla.1989) (citations omitted) *aff'd* 111 B.R. 1007 (S.D.Fla.1990).

Several courts have rejected the traditional Countryman test as the sole benchmark for determining whether a contract is subject to assumption or rejection.[7] These courts have employed a result-oriented approach which focuses upon whether or not the estate will benefit from the assumption or rejection of the contract rather than fundamentally looking at mutuality of commit-

ments. *In re Child World*, 147 B.R. at 851 (citing Westbrook, 74 Minn.L.Rev. at 282–83).

In applying what is now termed the functional approach, "it is necessary to work backward, proceeding from an examination of the goals rejection is expected to accomplish.... If those purposes have already been accomplished or if they cannot be accomplished through rejection, then the contract is not executory within the meaning of the Code." *In re Bluman*, 125 B.R. at 363 (quoting *In re Government Securities Corp.*, 101 B.R. 343, 349 (Bankr.S.D.Fla.1989) *aff'd*, 111 B.R. 1007 (S.D.Fla.1990) (citing *In re Jolly*, 574 F.2d 349, 351 (6th Cir.), *cert. denied*, 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978))).

"Those purposes include: (1) taking advantage of contracts which will benefit the estate; (2) relieving the estate of burdensome contracts; (3) promoting the debtor's fresh start; (4) permitting the allowance and determination of claims; and (5) preventing parties from remaining 'in doubt concerning their status vis-a-vis the estate.'" (citation omitted). *In re Bluman, supra.*

Without inferring the superior soundness of one analysis over the other, this Court will now examine the individual Employment and Separation Agreements *seriatim* to determine the capability and propriety of rejection in light of the purposes of section 365.

*The Maskaly Employment Agreement*

The employment relationship between Maskaly and Spectrum ended on December 31, 1994 when Spectrum hired a new chief executive officer. Under the terms of the Employment Agreement, Spectrum became obligated to pay Maskaly six months salary as a result of Maskaly's prepetition termination without just cause. On January 15, 1995, Maskaly received $10,416.67 representing the first and only termination payment from Spectrum. Spectrum also has a contingent obligation to indemnify Maskaly from

---

**7.** *See In re Jolly*, 574 F.2d 349 (6th Cir.1978), *cert. denied* 439 U.S. 929, 99 S.Ct. 316, 58 L.Ed.2d 322 (1978); *Cohen v. The Drexel Burnham Lambert Group, Inc. (In re The Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687 (Bankr. S.D.N.Y.1992); *In re Leonard Bluman*, 125 B.R.

359 (Bankr.E.D.N.Y.1991); *In re Government Securities Corp.*, 101 B.R. 343 (Bankr.S.D.Fla. 1989), *aff'd*, 111 B.R. 1007 (S.D.Fla.1990) (citing *In re Jolly*); *In re Taylor*, 91 B.R. 302 (Bankr. D.N.J.1988), *appeal dismissed*, 913 F.2d 102 (3d Cir.1990).

and against expenses and liabilities incurred by him arising out of events which may have occurred during his corporate capacity. Maskaly remains obligated to honor a confidentiality covenant and, for two years after termination, to abide by a non-interference covenant. Unlike the restrictive covenants set forth in the Separation Agreements, discussed below, Maskaly was not obligated under a non-compete provision.

■ Application of the traditional Countryman test clearly requires that there be continuing material obligations on both sides of a contract in order for the contract to be executory. *In re Chateaugay*, 102 B.R. at 345 (citation omitted). However, upon examining the Employment Agreement, the Court finds that Maskaly's remaining obligations of confidentiality and non-interference are vestiges of that Agreement that do not rise to a level of material future performance.

Spectrum received the substantial benefit of its bargain under the Employment Agreement, i.e., the services rendered by Maskaly. Clearly, in the event of Maskaly's breach of his remaining obligations, Spectrum would, at most, be entitled to injunctive relief and/or money damages and it is unlikely that Spectrum would be justified in suspending termination payments should Maskaly breach. *See In re Brian Nelson Drake*, 136 B.R. 325 (Bankr.D.Mass.1992) (finding contract did not contain continuing mutual obligations where debtor was obligated not to compete and non-debtor was obligated to make payments therefor); *In re Leonard Bluman*, 125 B.R. 359 (Bankr.E.D.N.Y.1991) (debtor's obligation to abide by a non-compete provision did not rise to level of material future performance); *see also In re Neil William Hawes*, 73 B.R. 584, 586 (Bankr.E.D.Wis.1987) (finding employment relationship had ended and debtor's remaining obligation to a restrictive covenant insufficient to make the contract executory); *In re Noco, Inc.*, 76 B.R. 839 (Bankr.N.D.Fla.1987); *Carstens Health Indus. v. Cooper (In re Cooper )*, 47 B.R. 842 (Bankr.W.D.Mo.1985) (both holding contracts were not executory where the non-debtor has

no further obligations, financial or otherwise, and the debtor's only remaining obligation was not to compete).

■ Moreover, Spectrum's obligations to make termination payments and its contingent obligation to defend and indemnify are insufficient to deem the Employment Agreement executory. As indicated above, where the only performance that remains is the payment of money, the contract will not be found to be executory. *See In re Wang Laboratories, Inc.*, 154 B.R. 389 (Bankr. D.Mass.1993) (employment agreement not executory where employee was no longer required to perform services and only remaining obligation was the payment of severance pay); *In re Chateaugay*, 102 B.R. at 345 (citations omitted); *In re THC Fin. Corp.*, 686 F.2d 799, 804 (9th Cir.1982) (indemnity agreement not executory because the only obligation due is the payment of money).

Accordingly, this Court concludes that the Maskaly Employment Agreement is not executory and may not be rejected by the Debtors.

*The Separation Agreements*

(1) *Peter Caserta*

By Separation Agreement dated July 1, 1994 (the "Caserta Separation Agreement"), Spectrum and Caserta agreed to terminate Caserta's employment as President and Chief Executive Officer under an Amended and Restated Employment Agreement (the "Caserta Employment Agreement") dated August 13, 1993, and amended three Stock Option Plan Agreements all previously entered into on October 27, 1991 and August 21, 1992.

The Caserta Separation Agreement imposed the following continuing obligations upon the parties: Spectrum was obligated to make a termination payment to Caserta in the amount of $534,500, payable (i) $234,500 upon execution of the Caserta Separation Agreement; and (ii) $300,000 by delivery of a promissory note payable without interest in 24 monthly installments of $12,500 beginning May 1, 1995 and ending on April 1, 1997.[8]

---

**8.** *See* July 1, 1994 Caserta Separation Agreement, ¶ 3, annexed to Debtors' moving papers as

Exhibit "C."

As reflected by Caserta's proof of claim filed with this Court, the sum of $300,000 remains due and owing on the Caserta Separation Agreement.[9] Additionally, Spectrum has a contingent obligation to indemnify Caserta with respect to any claims arising out of events which may have occurred during his corporate capacity. Caserta agreed to abide by restrictive covenants including confidentiality, non-interference, public statement provisions addressing negative or disparaging remarks about Spectrum, and non-competition obligations. The restrictive covenants expire on July 1, 1998.

### (2) A. Werner Pleus

Pleus' employment as General Executive pursuant to an August 13, 1993 Amended and Restated Employment Agreement (the "Pleus Employment Agreement"), was terminated by Separation Agreement dated September 1, 1994, (the "Pleus Separation Agreement"). The Pleus Separation Agreement also amended two pre-existing Stock Option Plan Agreements, both dated August 21, 1992.

Spectrum agreed to pay Pleus a $300,000 termination payment payable without interest over 24 months at $12,500 per month beginning September 1, 1994 and ending on August 1, 1996. The Pleus Separation Agreement also contained an indemnity provision obliging Spectrum to indemnify and defend Pleus to the same extent as if Pleus continued to be an officer of Spectrum.

Pleus agreed to comply with similar restrictive covenants imposed upon Caserta, i.e., confidentiality, non-interference, public statement and non-competition provisions. Pleus' obligation with respect to the restrictive covenants expire on September 1, 1998.[10]

*Similarities Concerning the Caserta and Pleus Separation Agreements*

The only continuing obligations on the part of Caserta and Pleus with respect to the termination of their employment are compliance with the restrictive covenants. Although the parties do not state that a breach of the restrictive covenants will be deemed material, they do, however, provide that if the restrictive covenants are breached and in the event such breach is capable of cure and the obligor fails to cure after notice, then, "in addition to any other remedies which may be available to Spectrum at law or in equity, Spectrum, upon notice ... may cancel any unpaid amount of the termination payment and any and all of the [unexercised] option.... Spectrum will also be entitled to specific performance...." [11]

However, assuming that these post-employment restrictive covenants are enforceable under applicable law, this Court finds that the fact that the Separation Agreements provide that Spectrum *may,* in addition to other remedies, cancel unpaid termination payments does not make compliance with the restrictive covenants a future performance on the part of Caserta and Pleus which rises to a level of materiality. Indeed, as noted by this Court in *In re Bluman,* albeit in the context of a restrictive covenant ancillary to the sale of a business, even if the Separation Agreements expressly declared such breach material and mandated suspension of payments, "it is doubtful it would be enforced as it would probably result in a forfeiture." *In re Bluman,* 125 B.R. at 362. Under New York law [12] a breach of contract is material if it is so substantial as to defeat the purpose of the transaction or so severe as to justify the other party's suspension of performance. *In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1496 (9th Cir.1991) (cit-

9. *See* Proof of Claim, No. 00934.

10. Additionally, the Pleus Separation Agreement separately restated terms of repayment by Pleus of a pre-existing $91,177.20 loan made by Spectrum to Pleus pursuant to a "Loan Agreement and Promissory Note" dated December 30, 1993. *See* September 1, 1994 Pleus Separation Agreement, ¶ 4, annexed to Debtors' moving papers as Exhibit "E."

11. *See* Caserta Separation Agreement and Pleus Separation Agreement, ¶ 9.

12. The Employment and Separation Agreements provide that they be construed and enforced according to the laws of the State of New York.

ing *Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 895 (2d Cir.1976)).

■ Here, the restrictive covenants are ancillary to the purpose of the Separation Agreements, to wit, the termination without cause of purportedly valid and enforceable employment agreements. A breach would not defeat the purpose of that transaction. As such, they are contingent obligations that do not rise to a level of material future performance. Moreover, in the event of a breach, the parties have at the outset provided for a right to cure and thereafter the exercise of available legal and equitable remedies which would entitle Spectrum to injunctive relief and/or money damages.

■ This Court concludes that where the remaining obligation on the part of the non-debtor under an employment or a termination of employment contract is compliance with restrictive covenants, such continuing obligation generally does not rise to the requisite level of materiality necessary to be considered executory. *See In re Bluman, supra; In re Drake, supra.*

■ As discussed above, Spectrum's continuing obligation to make termination payments and to indemnify do not make the Separation Agreements executory. *See In re Wang, supra; In re Chateaugay, supra; In re THC Fin. Corp., supra.* Indeed, Spectrum's obligation to make payment to Caserta is embodied in a promissory note. Such an obligation for the payment of money has been specifically referred to in the legislative history to section 365 as "not an executory contract." *See* H.R.Rep. No. 595, 95th Cong. 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, *supra.*

Thus, neither the Caserta nor the Pleus Separation Agreements contain the requisite material future obligations on both sides and, therefore, are not executory contracts.

#### (3) *Joseph Musacchio*

In consideration for Musacchio's agreement to terminate his employment under a June 9, 1992 Amended and Restated Employment Agreement, the March 31, 1994 Separation Agreement required Spectrum to make termination payments to Musacchio in an amount equal to and paid in the same manner as his base employment salary of $145,520. The aforesaid termination payment was payable over a 14 month period commencing March 31, 1994 and ending June 9, 1995. The Separation Agreement also terminated a Stock Option Plan Agreement dated September 3, 1993. Although Spectrum's payment obligations and automobile allowance obligation expired at the time of the hearing on the instant motion, at the time of filing Spectrum had five months of payments and one month of automobile allowance remaining. As in the case of Caserta and Pleus, Spectrum was obligated to indemnify Musacchio.

#### (4) *John Silver*

By undated Separation Agreement,[13] Silver's employment under a December 3, 1992 Employment Agreement was terminated along with Silver's options under a September 3, 1993 Stock Option Plan Agreement. Spectrum agreed to pay Silver a termination payment in the amount of his prior compensation of $75,000 per annum for a six week period; three weeks accrued vacation time, and $75,000 payable over four years commencing July 31, 1994 and ending on March 31, 1996. Similar to the above Separation Agreements, Spectrum was required to indemnify Silver.

*Similarities Concerning the Musacchio and Silver Separation Agreements*

■ The Musacchio and Silver Separation Agreements distinctly provide for Musacchio's and Silver's engagement as consultants for two-year terms ending on March 31, 1996 and on or about May 10, 1996, respectively. These consulting services include assisting Spectrum with investor relations and various aspects of existing and potential business relationships. Notably, the parties expressly agreed that "in no event shall [Musacchio and Silver] be required to spend more than three hours per week in rendering the consulting services ... [or] more than

---

**13.** In his Objection to the instant motion, Silver states that the Separation Agreement was en-tered into "on or about May 10, 1994." *See* Objection by Musacchio and Silver, ¶ 1.

100 hours of services during any twelve month period...."[14]

Notwithstanding the *de minimis* requirement for such consulting services, the consideration therefor, in both cases, is stated to be the termination payments described above.[15] Musacchio is also entitled to additional compensation "in an amount to be agreed upon" by the parties in writing as well as stock options for the purchase of Spectrum's common stock. Silver was granted additional compensation "in a manner and in an amount in accordance with the custom and practice of the industry" together with stock options.

On their parts, Musacchio and Silver are obligated to provide Spectrum with a right of first offer on any new development in the area of the Spectrum's business of wireless data communications with which they may become involved, as well as compliance with restrictive covenants for the two year term of each consulting agreement. Similar to the restrictive covenants set forth in the Caserta and Pleus Separation Agreements, Musacchio and Silver must abide by confidentiality, non-interference, public statement and non-compete provisions. Again, not expressly declaring a breach of the restrictive covenants material, the Separation Agreements provided that a breach would be deemed "just cause" which would permit Spectrum to cancel any unpaid termination payments and any options not vested. Nevertheless, for the reasons stated above, this Court reiterates that compliance with restrictive covenants under these facts and circumstances does not reach the level of material future performance necessary for deeming the contract executory.

■ Additionally, Musacchio and Silver have remaining obligations to provide consulting services which Spectrum claims is a material future obligation. Indeed, the Musacchio and Silver Separation Agreements provide that a failure to provide such services shall constitute "just cause" permitting Spectrum to terminate the Separation Agree-

ments and cancel any unpaid payments and any options not vested.

However, this Court finds that the continuing consulting obligations are *de minimis* and insufficient to render the Separation Agreements executory in light of the minute amount of time Spectrum required Musacchio and Silver to perform such services together with the fact that the consulting services were not required to be rendered at Spectrum's offices or other location selected by Spectrum, nor were Musacchio or Silver prohibited from accepting full time employment during the term of the consulting agreement provided such employment did not violate the restrictive covenants.

It is clear to this Court that the *de minimis* consulting requirement was not the material purpose underlying the Separation Agreements which was to terminate valid and subsisting employment agreements. Thus, a failure by Musacchio or Silver to render such services would likely be considered a minor departure for which Spectrum would be entitled to claim damages for whatever loss had been sustained, rather than a material breach justifying a discharge of Spectrum's obligation to make termination payments.

Thus, the Court finds that there are no remaining material obligations on the part of Musacchio and Silver. As previously noted, Spectrum's obligations to make termination payments and to indemnify are insufficient to render these Separation Agreements executory. Accordingly, this Court concludes that the Musacchio and Silver Separation Agreements are not executory contracts and are not subject to rejection under section 365.

#### (5) *Dana C. Verrill*

■ Although Verrill has not appeared in the instant proceeding, the Debtors have agreed to have the rejectability of his Separation Agreement determined in the context of the instant motion. Verrill's employment with Spectrum under a February 11, 1992

---

**14.** *See* March 31, 1994 Musacchio Separation Agreement, ¶ 6(b), annexed to Debtors' moving papers as Exhibit "D"; Undated Silver Separation Agreement, ¶ 5(b), annexed to Debtors' moving papers as Exhibit "F."

**15.** *See* March 31, 1994 Musacchio Separation Agreement, ¶ 6(d); Undated Silver Separation Agreement, ¶ 5(e).

employment agreement was terminated by Separation Agreement dated November 5, 1993. Spectrum agreed to make a $200,000 termination payment to Verrill payable in four consecutive annual installments of $50,000 each commencing on October 31, 1994 and ending on October 31, 1997. The Separation Agreement similarly contained a provision obligating Spectrum to indemnify Verrill in addition to placing certain limitations on the sale of shares of Spectrum's stock purchased by Verrill under various Stock Option Plan Agreements.

Verrill became obligated to abide by restrictive covenants expiring on November 5, 1995 which included non-competition and non-interference provisions. The parties provided that a breach of the restrictive covenants, without cure, would entitle Spectrum to injunctive relief.

The Verrill Separation Agreement separately provides for Verrill's engagement as a consultant for a five year term. However, such consulting services are to be rendered on an "as needed" basis as required by Spectrum.[16] Verrill is entitled to payment for such services only if requested to perform by Spectrum. Under these conditions Spectrum does not have an ongoing obligation to employ Verrill—Spectrum may simply refrain from requiring Verrill's services. Nor does Verrill have an ongoing obligation to perform—Verrill must merely use his "best efforts to be available on an 'as needed' basis." It is hornbook law that a "best effort" obligation is not an "absolute obligation."

In view of the foregoing facts and circumstances, this Court finds that the only material future obligation remaining is on the part of Spectrum, to wit, to make termination payments. As discussed above, this is insufficient to render the Separation Agreement executory.

Application of the functional approach similarly supports the conclusion that the Maskaly Employment Agreement and the foregoing Separation Agreements are not executory contracts. Declaring such Agreements to be executory and approving their

rejection would accomplish none of the goals rejection is expected to accomplish and would not confer any benefits upon the Debtors' estates. Rejection will not clarify the status of the parties, vis-a-vis the estate, nor will rejection impact upon the allowance and determination of the non-debtors' claims. Rejection would give rise to a breach permitting the non-debtors to file prepetition claims for damages as general unsecured creditors. However, the result is the same if the contract is not rejected. This Court follows the recent holding of *Stewart Foods, Inc. v. Broecker* (*In re Stewart Foods, Inc.*), 64 F.3d 141 (4th Cir.1995) in which the Fourth Circuit stated that "regardless of the nature of the contract, if at the time of the bankruptcy filing the debtor has an obligation under the contract to pay money to the non-debtor party, that obligation is handled as a prepetition claim in the bankruptcy proceedings." *Id.* The allowance and determination of the non-debtors' claims is not the subject of this proceeding. Thus, rejection of the Employment and Separation Agreements will not change the character or the priority of such claims.

In view of the foregoing, this Court finds that the Employment and Separation Agreements are not executory contracts and are not subject to rejection under section 365. Accordingly, Spectrum's motion for an order approving rejection of the Employment and Separation Agreements is denied.

### CONCLUSIONS

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (b)(2)(O).

2. The Debtors' motion for an order approving rejection of certain agreements is denied.

SUBMIT AN ORDER IN CONFORMITY WITH THIS DECISION.

---

16. *See* November 5, 1993 Verrill Separation Agreement, ¶ 2, annexed to the Debtors' moving papers as Exhibit "G."