In re **BRYANT UNIVERSAL ROOFING,**
**INC., and related proceedings,**
**Debtor**

Applicable Debtors First Western Building Services, Inc. (Case No. 96–03732–PHX–JMM), Bryant Universal Roofing, Inc. (Case No. 96–03726–PHX–CGC), Bryant Universal Commercial Roofing, Inc. (dba. Universal Roofers, Inc.) (Case No. 96–03727–PHX–GBN), Bryant Organization, Inc. (Case No. 96–03728–PHX–SSC), American Contracting Services, Inc. (Case No. 96–03731–PHX–CGC), B.U.R., Ltd. (Case No. 96–07370–PHX–SSC), Superior Weatherproofing, Inc. (Case No. 96–03733–PHX–CGC).

Bankruptcy No. BR–96–03726–PHX–CGC.

United States Bankruptcy Court,
D. Arizona.

Feb. 27, 1998.

Robert D. Beucler, Brandes Lane, P.C., Phoenix, AZ, for Roger W. Brown, Case Trustee.

Thomas J. Salerno, Rawle Andrews, Jr., Squire, Sanders & Dempsey L.L.P., Phoenix, AZ, for debtor.

Carolyn J. Johnsen, Jonathan P. Friedland, Hebert Schenk & Johnsen, P.C., Phoenix, AZ, for Wayne Mullis.

## ORDER RE: WAYNE MULLIS' MOTION FOR SUMMARY JUDGMENT

CHARLES G. CASE, II, Bankruptcy Judge.

### (Under Advisement Ruling)

### I. Introduction

This matter comes before this Court on Creditor Wayne Mullis' ("Mullis") Motion for

Summary Judgment On Motion to Compel Payment of Claims. Mullis asserts he has a post-petition, pre-rejection administrative rent claim under § 365(d)(3) entitling him to immediate payment and an administrative employment claim under § 503(b)(1). Trustee Roger W. Brown ("Trustee") disagrees, arguing there is no administrative rent claim because Debtor terminated the lease pre-petition and no administrative employment claim because Mullis provided no services of benefit to Debtor and the employment contract between Mullis and Debtor was no longer executory because "Mullis was on his way out." For the following reasons, this Court grants Mullis' motion in part and denies it in part.

## II. FACTUAL BACKGROUND

The facts are undisputed. In 1989, Debtor merged with Universal Roofers, Inc. ("Universal"), which Mullis founded in 1968. Debtor and Mullis entered into an Employment Agreement, in which Mullis agreed, *inter alia*, to serve as the Chairman of the Board of Debtor in exchange for compensation.[1] Debtor also assumed several of Universal's lease contracts at the time of the merger, including the lease of property owned by Mullis at 2829 Ruthrauff Road, Tucson, Arizona ("Lease"). The Lease was a triple net lease for $48,000 a year, payable in equal monthly payments of $4,000. The parties extended the term of the Lease until August, 1996, after its initial five year term.

On November 30, 1995, James Constance, chief executive officer of Debtor, wrote Mullis, stating that effective January 31, 1996, Debtor intended to vacate the Ruthrauff property. Mullis acknowledged receipt of the letter and responded:

I have put the property up for sale. There are of course no guarantees or reliable estimates how long it may take to sell the property.

It is important that I remind you that the company has a lease obligation for all of 1996. I will expect Bryant Universal to honor that lease. I do not anticipate experiencing losses in 1996 on the Tucson property. I think it might be appropriate for Bryant Universal to be looking for a suitable and acceptable sub-tenant for the next 12 months. If you were able to find a [sic] acceptable tenant this could help you mitigate some of the companies [sic] losses in 1996.

Debtor did not vacate the property in January. On January 18, 1996, Debtor and Mullis entered into a Settlement Agreement and Release in which the parties agreed to continue to "honor their respective rights and obligations under the existing leases with respect to the Leased Premises." The Settlement Agreement defined Leased Premises as "all of the real property currently leased, occupied and/or used by the Company from Mullis in Phoenix, Arizona and Tucson, Arizona, and as covered by the existing leases between Mullis and the Company."

Also as part of the Settlement Agreement, the parties clarified "certain aspects of the relationship between the Company and W. Mullis," while acknowledging that they would both "continue to honor their respective obligations under the Employment Contract until the expiration of its existing term."

Subsequently, on or about March 31, 1996, Debtor vacated the Tucson premises. Debtor filed bankruptcy under Chapter 11 on April 17, 1996.

## III. ANALYSIS

### A. *Mullis' Post–Petition, Pre–Rejection Administrative Rent Claim*

A bankruptcy trustee has 60 days from the date of the order for relief to decide whether to assume or reject an unexpired lease of a lessee debtor. 11 U.S.C. § 365(a) & (d)(4). During those 60 days, the trustee must continue to "perform all the obligations of the debtor" under that lease. *Id.* at § 365(d)(3). The Ninth Circuit has held that this means a commercial lessor has an administrative claim for all accrued, unpaid, post-petition rent between the date of the bankruptcy petition and the date of rejection. *In re Pacific–Atlantic Trading Co.*, 27 F.3d 401, 403 (9th Cir.1994). On this ground, Mullis stakes his claim for the full amount of

---

1. The specific terms of the agreement are set forth in more detail in section B, *infra*.

the rent accrued between April 17, 1996, and the date the lease was deemed rejected under § 365(d)(4).

Trustee disagrees, arguing that § 365 is irrelevant because there was no unexpired lease in effect at the time Debtor filed bankruptcy. Under § 365(c)(3), "[t]he trustee may not assume or assign any ... unexpired lease of the debtor ... if ... such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief." *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1469 (9th Cir.1988). "Simply put, if a lease of nonresidential property has been terminated under state law before the filing of a bankruptcy petition, there is nothing left for the trustee to assume." *Id.* (citing *Kearny Mesa Crossroads v. Acorn Investments*, 8 B.R. 506, 510 (Bankr.S.D.Cal.1981)).[2]

■ Trustee claims Debtor not only unequivocally notified Mullis it intended to abandon the property, but that it did in fact abandon the property when it vacated the premises on or about March 31, 1996, thereby terminating the Lease pre-petition. Debtor's abandonment on or about March 31, 1996, however, does not alone amount to a surrender by operation of law. *See,* Restatement (Second) of Property (Landlord–Tenant) § 12.1(i). "Abandonment occurs when the lessee vacates the premises with 'intent to relinquish all right therein,' " *Gangadean v. Erickson*, 17 Ariz.App. 131, 133, 495 P.2d 1338, 1340 (1972) (citing 51C C.J.S. Landlord & Tenant § 125(2) (1968)), and there is "an unqualified retaking of possession of the property by the landlord," *Riggs v. Murdock*, 10 Ariz.App. 248, 251, 458 P.2d 115, 118 (1969). *See also Butler Products Co., Inc. v. Roush*, 153 Ariz. 500, 502, 738 P.2d 775, 777 (App.1987). This is a question of fact dependent on all surrounding circumstances, and the facts are not in dispute here. *See Lee Development Co. v. Papp*, 166 Ariz. 471, 477, 803 P.2d 464, 470 (App.1990); *Riggs*, 10 Ariz. App. at 251, 458 P.2d at 118.

While Debtor did notify Mullis in a letter on November 30, 1995, that it intended to vacate the property on January 31, 1996, it did not in fact vacate the property at this time. Moreover, Debtor entered into a Settlement Agreement and Release on January 18, 1996, with Mullis, in which it agreed to continue to honor its existing obligations under its existing leases with respect to the Leased Premises. The agreement clearly defines Leased Premises to mean "all of the real property currently leased, occupied and/or used by the Company from Mullis in Phoenix, Arizona and Tucson, Arizona." Trustee's argument that this definition is unclear and creates a fact question rings hollow. Trustee fails to provide this Court with anything to suggest that the parties did not intend to include the Tucson property within this description or that the Tucson property no longer qualified under the terms of this provision. When January 31, 1996, came and went with Debtor still occupying the property, Mullis had no reason to believe Debtor was still intending to abandon the property, especially in light of Debtor's reaffirmation of the Lease several weeks earlier.

■ Further, Mullis' response to Debtor's November 30, 1995, letter indicated that Mullis did not intend to accept Debtor's January abandonment as a release of Debtor's obligations under the Lease for 1996. In accordance with his rights under the Lease Agreement, Mullis notified Debtor that he intended to try to relet the property to mitigate damages and expected Debtor to attempt the same. In a commercial lease arrangement, the landlord's attempt to relet the premises does not constitute acceptance by the landlord of the tenant's abandonment, but is part of the landlord's duty to mitigate damages. *See Lee Development Co.*, 166 Ariz. at 477, 803 P.2d at 470; *Riggs*, 10 Ariz.App. at 251, 458 P.2d at 118. For these reasons, this Court finds that the Lease was still in effect at the time of bankruptcy.

Because there was no pre-petition termination of the Lease, this Court concludes that Mullis has a post-petition, pre-rejection administrative rent claim. Trustee does not

---

**2.** Arizona state law governs here where the Lease Agreement specifically stated it would be construed in accordance with the laws of Arizona.

dispute that once this Court finds the lease terminated post-petition, § 365(d)(3) "confer[s] upon a commercial lessor an administrative claim for all accrued, post-petition rent irrespective of any utility provided to the bankruptcy estate by the lease." The Ninth Circuit recently held that § 365(d)(3) entitles the lessor to the full amount of the rent due under the nonresidential real property lease during the 60-day period pending assumption or rejection. *Pacific–Atlantic Trading Co.,* 27 F.3d at 403. The court effectively overruled *In re Orvco,* 95 B.R. 724 (9th Cir. BAP 1989), in which the BAP had concluded "where a lease of nonresidential property is deemed rejected, and the trustee has not paid rent during the period prior to rejection, 'a lessor must establish its claim for administrative status under section 503(b)(1)(A)'" by showing the fair and reasonable value conferred upon the estate by the debtor's continued use of the property. *Id.* at 404 (quoting *In re Orvco,* 95 B.R. at 728).

■ Mullis is not entitled to immediate payment of his administrative claim, however. Section 365(d)(3) states that the "trustee shall timely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." Courts have interpreted the language in subsection (d)(3) in a myriad of ways, with courts in the same jurisdictions reaching different results.[3]

Section 365(d)(3) and (d)(4) were added to the Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. 98–353, 98 Stat. 333 (1984). Before the amendments, landlords found themselves having to provide current services to debtors without receiving current lease payments from debtors while the trustee decided whether to assume or reject the lease. "The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent ... and other charges on time pending the trustee's assumption or rejection of the lease." 130 Cong.Rec. S8, 994–95 (daily ed. June 29, 1984) (statement of Sen. Hatch), quoted in *In re Granada, Inc.* 88 B.R. 369, 371 (Bankr.D.Utah 1988). However, contrary to what other courts have concluded, this language does not mean Congress intended to create a super-priority administrative claim under § 365(d)(3).

The express changes themselves protect the landlords from the very concerns Senator Hatch identified. First, the changes limit the time the trustee has to assume or reject the lease to 60 days from the order for relief, subject to court approved extensions provided the trustee has remained current on the lease payments. If the trustee fails to act, the lease is deemed rejected. Second, the changes require the trustee to remain current on the payments or the lease will be deemed rejected unless the trustee becomes

---

3. Some require immediate payment of the prerejection rent. *See In re Brennick,* 178 B.R. 305 (Bankr.D.Mass.1995) (ordering immediate payment and no requirement of future disgorgement if estate found administratively insolvent); *In re Telesphere Communications, Inc.,* 148 B.R. 525 (Bankr.N.D.Ill.1992) (same as *Brennick*); *In re Rare Coin Galleries of Am., Inc.,* 72 B.R. 415 (D.Mass.1987) (ordering immediate payment even though estate administratively insolvent). Others refuse to grant the lessor immediate payment, concluding that this amounts to a super-priority not expressly provided for statutorily. *See In re Joseph C. Spiess Co.,* 145 B.R. 597 (Bankr.N.D.Ill.1992); *In re Virginia Packaging Supply Co., Inc.,* 122 B.R. 491 (Bankr.E.D.Va. 1990) (no super-priority, but may pay if showing that all administrative claims will be paid in full or same pro rata amount); *In re Granada, Inc.,*

88 B.R. 369 (Bankr.D.Utah 1988) (no super-priority status, but shall pay unless trustee shows "substantial doubt" that there will be enough funds to pay all administrative claims ultimately); *In re Tandem Group, Inc.,* 61 B.R. 738 (Bankr.C.D.Cal.1986) (same as *Virginia Packaging*). And still others grant immediate payment to the lessor but require disgorgement later to the extent necessary to provide all administrative claimants a pro rata share when the estate is administratively insolvent. *See In re Almac's, Inc.,* 167 B.R. 4 (Bankr.D.R.I.1994); *In re Four Star Pizza,* 135 B.R. 498 (Bankr.W.D.Pa.1992); *In re Buyer's Club Mkts., Inc.,* 115 B.R. 700 (Bankr.D.Colo.1990); *In re Cardinal Indus., Inc.,* 109 B.R. 738 (Bankr.S.D.Ohio 1989); *In re Dieckhaus Stationers of King of Prussia, Inc.,* 73 B.R. 969 (Bankr.E.D.Pa.1987).

current. Third, the landlord is granted an administrative claim without the necessity of notice and a hearing. Fourth, the amount of the administrative claim granted is now governed by the terms of the lease. This Court's decision not to grant the landlord the immediate right to payment does not destroy these protections or interfere with congressional intent.

Nothing in § 365 indicates that Congress intended to create a super-priority. Nor does § 503, which governs the allowance of administrative expenses, indicate Mullis' claim should be granted super-priority. Further, § 507, which determines the priority status of administrative claims, is noticeably silent as to any priority for claims arising under § 365(d)(3).

This conclusion is further supported by the BAP's decision in *In re Orvco*, 95 B.R. 724 (9th Cir. BAP 1989). While *Pacific–Atlantic*, *supra*, overruled *Orvco* to the extent that *Orvco* required the landlord to prove the reasonableness of its rent, *Pacific–Atlantic* did not address whether the landlord is entitled to immediate payment of its administrative claim. In fact, the court expressly declined to decide this issue where there was no dispute that there were enough funds to pay all administrative claimants in full. 27 F.3d at 405. The *Orvco* court concluded that there is no super-priority under § 365(d)(3). "In the absence of such language, we hold that after rejection of the lease, the payment of an administrative claim for rent, like all other administrative claims is within the sound discretion of the bankruptcy court and should be determined under section 503." 95 B.R. at 728. The court concluded that it would not award immediate payment where the record indicated there may insufficient funds in the estate to pay all administrative claimants in full. *Id.* Other courts within the Ninth Circuit have followed *Orvco*, and this Court will also. *See In re MS Freight Distribution, Inc.*, 172 B.R. 976, 978 (Bankr. W.D.Wash.1994).

Further, because this administrative expense claim arose under Chapter 11 before conversion, it is now subordinated to Chapter 7 administrative expenses pursuant to § 727(b). *In re Tandem Group, Inc.*, 61 B.R. 738, 741 (Bankr.C.D.Cal.1986). Subsection 726(b) states that administrative expenses incurred while a case is pending under Chapter 7 shall be paid prior to administrative expenses incurred under any other chapter proceeding. *See also In re Granada, Inc.*, 88 B.R. 369, 373 (Bankr. D.Utah 1988).

**B.** *Mullis' Administrative Employment Claim*

 Mullis claims he is entitled to an administrative employment claim under § 503(b)(1) because the Trustee failed to assume or reject his employment contract under § 365(a). Trustee argues there was no employment contract in existence between Mullis and Debtor at the time Debtor filed for bankruptcy and, therefore, no executory contract to assume or reject. "The option to assume or reject is limited to contracts that are executory." *In re Spectrum Information Technologies, Inc.*, 193 B.R. 400, 404 (Bankr.E.D.N.Y.1996). The first question, therefore, is whether an executory contract existed at the time Debtor filed for bankruptcy.

 A contract is executory if the "obligations of both the bankrupt and the other party to the contract are so far unperformed [at the time of filing] that the failure of either to complete performance would constitute a material breach excusing performance of the other." *Collingwood Grain, Inc. v. Coast Trading Co., Inc.* 744 F.2d 686, 692 (9th Cir.1984) (quoting *In re Select–A–Seat Corp.*, 625 F.2d 290, 292 (9th Cir.1980)). The question is whether the remaining obligations rise to the level of material future performance. *In re Spectrum Information Technologies, Inc.*, 190 B.R. 741, 748 (Bankr.E.D.N.Y.1996). Generally, where the only performance obligation remaining under the employment contract is the payment of money, the contract will not be found executory. *Id.; see also In re THC Fin. Corp.*, 686 F.2d 799, 804 (9th Cir.1982); *Benevides v. Alexander*, 670 F.2d 885, 887 (9th Cir.1982). An agreement to refrain from action, however, may be considered executory. *Fenix Cattle Co. v. Silver (In re Select–A–Seat Corp.)*, 625 F.2d 290, 292 (9th Cir.1980) (agreement promising to

refrain from selling product to others is executory).

■ The parties agree that Debtor and Mullis had a written Employment Agreement ("Contract") at one time, which commenced September 1, 1991, and terminated by its terms on December 31, 1996. The Contract provided Mullis an annual salary of $365,000 ($28,028.94 a month), four weeks of paid vacation a year, medical insurance, memberships in the Arizona Club and Phoenix Country Club, and an $800 a month car allowance. In exchange, Mullis agreed to serve as the Chairman of the Board, "or in such other capacities as maybe be requested from time to time by the Board of Directors." Mullis also promised to devote his full time and exclusive attention to the business and welfare of Debtor. And, unless the Special Committee of Board of Directors gave its prior written consent, Mullis agreed not to engage in any other employment for any direct or indirect compensation. The Contract could be terminated at Debtor's election for good cause or voluntarily by Mullis for any reason. Good cause is defined in a separate paragraph of the Contract to mean generally any criminal conduct of Mullis, the failure of Mullis to perform his duties according to the Contract, or gross negligence or insubordination in performing his duties. However, these latter grounds for termination required written notice to Mullis first and time within which for him to remedy the problem. Further, any modifications to the Contract had to be in writing and signed by the parties.

The Trustee argues that the subsequent Settlement Agreement and Release ("Settlement Agreement") in effect terminated the Employment Agreement. Nowhere in the Settlement Agreement, however, did the parties say they were terminating the existing employment contract or Mullis' employment with Debtor. In fact, despite some modifications to the Employment Agreement, the parties affirmed their contractual relationship:

Both the Company and W. Mullis will continue to honor their respective obligations under the Employment Contract until the expiration of its existing term. Notwithstanding the foregoing, on the Effective Date the Employment Contract shall be modified as follows:

A. *Outside Activity.* Notwithstanding any provision in the Employment Contract to the contrary, the company agrees that Mullis may act as a technical advisor and/or consultant ... for manufacturers, distributors, contractors and/or other parties *provided:*

\* \* \* \* \* \*

B. *Board Designated Assignments.* Notwithstanding any provision of the Employment Contract and/or prior assignments given to W. Mullis by the Board under the Employment Agreement, the parties agree that upon the Effective Date, the Company waives its rights with respect to any prior Board Designated Assignments which have been given, and W. Mullis waives the requirement that the Company provide Board Designated Assignments as a condition to having Mullis away from the day-to-day operations of the Company and otherwise under Paragraph 2 of the Employment Contract. In this regard, W. Mullis agrees that the Company may request that W. Mullis not be involved with the operations of the Company without giving W. Mullis any specific task or tasks.

\* \* \* \* \* \*

D. *Mullis' Continued Service As Company Designee.* The Company agrees that through the termination date of the Employment Contract, W. Mullis: (i) may continue to function as a trustee for the National Roofing Industry Pension Trust, as a member affiliated with a signatory contractor; and (ii) may remain as one of the Company's designated members of the National Roofing Contractors Association, with the company reserving the right in its sole discretion to appoint additional designees as appropriate at the discretion of the Board. Further, W. Mullis will only vote at the Company's direction.

Mullis also continued as the Resident Management Employee and qualifying party with respect to the company's contractor's licenses and agreed to remain so for the six months following the Settlement Agreement.

While it is apparent that Debtor was seeking to limit Mullis' role with the company, it did not expressly terminate the relationship in the Settlement Agreement. And, certainly, Debtor never terminated Mullis under the terms of the Employment Agreement. More important, Mullis still had responsibilities to Debtor he had to perform. For example, Mullis still had to forego acting as an outside consultant unless he received approval from the Board and the work did not conflict with Mullis' current Board obligations. Mullis still served on the Board and could be required by Debtor at any time to perform various obligations to the company at the Board's request, although the Board also reserved the right not to have Mullis involved in the day-to-day operations of the company. Mullis did not resign this Board position until June 30, 1996. Further, Mullis continued to be the Resident Management Employee, thereby allowing Debtor to conduct business lawfully in various states. The Trustee does not dispute Mullis' claim that he attended Board of Directors' meetings from April, 1996, to June, 1996, as a member of the Board. Nor does the Trustee dispute that Mullis helped Debtor sell some of Debtor's assets during this bankruptcy to some of Mullis' industry contacts. In turn, Debtor still agreed to pay Mullis his salary and various benefits and expenses.

Thus, the contract was executory. Because the Trustee failed to assume or reject within 60 days of the order for relief under Chapter 7, it is deemed rejected. 11 U.S.C. § 365(d)(1). Whether the contract was affirmatively rejected or deemed rejected, rejection constitutes a breach of the contract as of the date of the bankruptcy petition and gives rise to a claim for breach of contract damages, or in bankruptcy terms, a general unsecured claim under § 11 U.S.C. § 365(g). *See In re Cochise College Park, Inc.,* 703 F.2d 1339, 1352 (9th Cir.1983); *In re Spectrum,* 193 B.R. at 404. It may also give rise to an administrative claim under § 503(b)(1)(A) for "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." *In re Dant & Russell, Inc.,* 853 F.2d 700, 706 (9th Cir.1988). "Actual" and "necessary" are construed narrowly to keep fees and costs to a minimum, and to cover only those obligations that arise post-petition. *Id.* For example, the employee must work during the post-petition period or else there is no benefit to the estate post-petition justifying the expense. *In re Palau Corp.,* 139 B.R. 942, 944 (9th Cir. BAP 1992). "It is clear from the plain language of Section 503(b)(1)(A) that administrative priority is given only to those expenses which represent 'services rendered after the commencement of the case.'" *Id.* (quoting 11 U.S.C. § 503(b)(1)(A)).

Here, Mullis is entitled to compensation on an administrative basis for his post-petition employment from April 17, 1996, until his resignation on June 30, 1996. Significantly, the debtor-in-possession took no action to reject this Contract prior to Mullis' resignation or to seek an order limiting its effect in these proceedings. Indeed, only three months before the filing, the Debtor agreed to "honor [its] ... obligations under the Employment Contract until the expiration of its existing term [December 31, 1996]." Clearly, the Debtor and Mullis were in the process of separation, but a key item of consideration in that process was the continued obligation of the company to honor the Employment Agreement. As noted in the Trustee's supplemental facts, Mullis was the resident management authority under the Debtor's contractor's license and his termination without a qualified replacement would cause serious operational problems for the company.

■ While Mullis was no longer "running the show," he did render services to the Debtor post-petition and remained on the Board. The precise question presented is whether he should be allowed a claim based on the Contract or upon the basis of "quantum meruit."

As noted above, Congress amended § 365(d)(4) in 1984 to state expressly that an estate's administrative liability under an unexpired lease is governed by the lease's terms; no similar amendment was made then or at a subsequent time for employment agreements. Most wage claimants do not have an employment contract; as a result, their claims are measured against the benefit

provided to the estate for work performed. Here, the question is what weight should be given to the agreed upon "benefit" negotiated by the parties and incorporated in the Employment Agreement. The basic rule is provided in the Supreme Court's opinion in *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984):

> "If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending decisions to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, ... which, depending on the circumstances of a particular contract, may be what is specified in the contract."

465 U.S. at 531, 104 S.Ct. at 1199.

There is a paucity of authority on the extent to which the terms of an unassumed pre-petition employment contract govern the amount of compensation due to an employee as an administrative expense. Most cases in this area relate to whether severance pay is properly allowable as an administrative expense. *See, e.g., Teamsters Local No. 310 v. Ingrum (Matter of Tucson Yellow Cab Co., Inc.),* 789 F.2d 701, (9th Cir.1986); *In re Selectors, Inc.,* 85 B.R. 843 (9th Cir. BAP 1988); *In re Spectrum Information Technologies, Inc.,* 193 B.R. 400 (Bankr.E.D.N.Y. 1996); *In re Hooker Investments, Inc., LJ,* 145 B.R. 138 (Bankr.S.D.N.Y.1992); *In re Uly–Pak, Inc.,* 128 B.R. 763 (Bankr.S.D.Ill. 1991); *In re Allegheny International, Inc.,* 118 B.R. 276 (Bankr.W.D.Pa.1990); *Miami General Hosp., Inc.,* 89 B.R. 980 (Bankr. S.D.Fla.1988); *In re Beco, Inc.,* 46 B.R. 563 (Bankr.W.D.La.1985). Some cases deal with bonuses. *See, In re Amarex, Inc.,* 853 F.2d 1526 (10th Cir.1988); *In re the Drexel Burnham Lambert Group, Inc.,* 138 B.R. 687 (Bankr.S.D.N.Y.1992).

The only case found by the Court (and not cited by either party) that addresses a contractual salary claim is *In re Midland Capital Corporation,* 82 B.R. 233 (Bankr.S.D.N.Y.

1988). There, a corporation entered into a management contract with two individuals immediately pre-petition, and in contemplation of a Chapter 11 filing, for payment of salaries in the aggregate amount of $30,-000.00 per month. The contract was not assumed, and the managers eventually resigned under pressure from the creditors' committee. The court held that the contracts had not been entered into in the ordinary course of business and limited the managers' claims to quantum meruit.

The present situation is more different than the same. The Contract was negotiated substantially before the case was filed. The Settlement Agreement reaffirmed that both parties would be bound by its terms. However, the record is also clear that Mullis did not draw at the Contract rate before the new owners "tried to throw him out." Prior to that time, he was paid at the rate of $125,000 per year or $10,166.67 per month. This fact undercuts Mullis' argument that he is entitled to the Contract amount without modification.

The Court will therefore use the Contract as a persuasive but not binding guide to a determination of the appropriate amount of Mullis' claim[4] and will allow Mullis an administrative employment claim of between $24,-735.00 and $68,194.00.[5] Although both parties have submitted extensive statements of fact, it is inappropriate on summary judgment to resolve the factual controversy that exists here. With the issue so limited, an evidentiary hearing can be promptly set and concluded within 2 hours. A scheduling conference will take place on **Wednesday, March 11, 1998, at the hour of 10:00 a.m.,** at which time a final hearing will be set.

**So ordered.**

---

4. The Court will disallow any claim for vacation time, club membership, car allowance, medical insurance or collection costs. These are not "ordinary and necessary" costs, given the limited nature of Mullis' work post-petition.

5. The amount of $24,735.00 is based upon 2.433 months (petition date to termination) at $10,-166.67 per month and $68,194.00 is based upon 2.433 months at the requested monthly rate of $28,028.94.