[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs are individuals who loaned the sum of $175,000 pursuant to loan purchase agreements to Gem Technologies, Inc. (hereinafter "Gem-CT"). Under the transaction, Gem-CT issued notes to the plaintiffs which could not be prepaid for a two year CT Page 6585 period and were convertible at the option of the plaintiffs into shares of Gem-CT up until the time the notes were paid.
The funds were initially provided as seed money to assist in raising money to develop a project known as the ADA compiler which would, hopefully, convert a particular computer language into a machine code which could then be read by a computer chip. A portion of the sums provided by the plaintiffs were utilized to purchase another company known as Enertronix, a Utah corporation, whose name was immediately changed to Gem Technologies, Inc. (hereinafter Gem-Utah). Gem-Utah eventually became Alydaar Software Corporation ("Alydaar"), a company involved in the solution of the Y2K problem. The project regarding the ADA compiler was not successful, and the business of Alydaar was successful. The plaintiffs claim that the funds provided by them to Gem-CT were eventually used by the defendant Gruder to acquire stock, in his own name, in Alydaar.
The plaintiffs have now brought suit in a multi-count complaint against Robert Gruder ("Gruder"), President of Gem-CT, Gem-Utah and Alydaar; Robert Dudchik, an employee of Gem-CT, Gem-Utah and Alydaar; Gem-CT and Alydaar. The plaintiffs assert various causes of action including fraud, breach of fiduciary duty, and claims based upon the Connecticut Unfair Trade Practices Act (CUTPA). The plaintiffs seek various forms of relief including monetary damages, injunctive relief, declaratory judgments and imposition of a constructive trust.
Gem-CT was incorporated pursuant to Connecticut law by Gruder in January of 1989 for the purpose of developing the ADA compiler. In September of 1989, Gruder met with representatives of the plaintiffs on various occasions for the purpose of obtaining seed money to assist in the development of the ADA compiler. It was understood by all parties that it was necessary to raise an additional $3 million dollars in order for the project to be successful. Various meetings resulted in the execution of note purchase agreements on October 2d 1989. Pursuant to those agreements, the plaintiffs provided the sum of $175,000 to Gem-CT. The agreements contained provisions for the repayment of the loans with interest and also provided that the plaintiffs could, under certain conditions, convert the loan into non-dilutable shares of stock of Gem-CT.
On October 9th, 1989, Gruder and Dudchik traveled to Texas and acquired, for the sum of $58,000, a public shell company CT Page 6586 known as Enertronix, a Utah corporation. The purchase of the public shell was believed to be useful in raising the $3 million dollars needed for the ADA compiler project. The seller of Enertronix retained one percent of the stock and the remainder of the stock was given to Gruder "as trustee." However, no stock book of Gem-Utah has ever been produced. The name of the company was immediately changed from Enertronix to Gem Technologies, Inc. (i.e. Gem-Utah).
Thereafter, Gruder made numerous conflicting statements to the plaintiffs and others with respect to the relationship between the two companies; i.e., Gem-CT and Gem-Utah. At times he indicated that Gem-Utah owned Gem-CT; at other times he indicated that Gem-CT owned Gem-Utah; at other times he indicated that the companies had merged; at other times he indicated that one company or the other was a subsidiary. However, it appears that there was no official merger or other formal legal documents executed with respect to the relationship between Gem-CT and Gem-Utah.
In 1989 and 1990, Gruder told the plaintiffs and others that the company could be purchased publicly through the "pink sheets." During this period and thereafter, the public company, Gem-Utah, had no assets and was not engaged in any business but was in fact publicly traded.
With respect to the use of the word "trustee", Gruder also made conflicting statements. On occasion, he testified that the property was his; on other occasions he testified that it was for the benefit of Gem-CT; on other occasions he testified that he would merge the companies "if it made sense"; and even testified that he thought the word "trustee" might have been a misprint. Gruder's prior work experience included employment as a loan officer at a bank, and it is clear that Gruder knew that owning property as a "trustee" is different than owning property in one's own name. It is also clear that Gruder knowingly caused the stock taken as "trustee" to be placed in his individual name so that he eventually became a substantial stockholder in Alydaar.
The plaintiffs attempted to obtain a meeting with Gruder to review financing, payments, capital structure and the number of shares that would be available to them upon conversion. A meeting was scheduled in November of 1990, which Gruder was unable to attend because he was out of the country attempting to raise money for Gem-CT. However, on November 27th, Gruder faxed a CT Page 6587 communication to representatives of the plaintiffs noting that Gem-CT owned 95.75 percent of Gem-Utah. This was the first occasion that the plaintiffs were aware that no merger had taken place.
Gruder continued, unsuccessfully, to attempt to raise funds for Gem-CT and no claim is made by the plaintiffs with respect to any failure on Gruder's part in his attempt to raise such funds.
In February of 1991, another company, Gem Technologies Computer Corp., was formed, also in an attempt to raise additional funds. By that time, however, it was apparent that additional funds had not been raised and the likelihood of raising additional funds was extremely slim.
In June and September of 1991, the plaintiffs wrote to Gruder noting that Gem-CT was in default on the payments called for under the note purchase agreements. In January of 1992, the attorney for the plaintiffs notified the plaintiffs that the debts were uncollectible. In April of 1992, notice was forwarded by the State of Connecticut of the intent to dissolve Gem-CT for failure to file financial reports, and Gem-CT was dissolved for that reason at the end of July, 1992.
On July 29, 1992, Gruder sold stock in the public company for $5,000. Gruder testified that he does not know the name of the individual to whom the stock was sold nor does he recall the amount of stock that was sold.
In August of 1992, a previously noticed meeting of the shareholders of Gem-Utah was held. The address of Gem-Utah was changed to Crown Street in New Haven. The name of Gem-Utah was changed to Alydaar Software Development Co., and there was a change of domicile from Utah to Connecticut. Also in July and August of 1992, Alydaar began opening an office in New Haven by acquiring rental space, telephones, letterheads and computers.
In September of 1992, Gruder offered to make gifts of Alydaar stock to some, but not all of the shareholders of Gem-CT. None of the plaintiffs received such a gift. On September 18, 1992, Gruder made application for personal bankruptcy where he listed the value of the Alydaar stock as $28,500. He moved to dismiss the bankruptcy on January 8, 1993, because he did not want his creditors to acquire the Alydaar stock. His personal bankruptcy was dismissed on May 26, 1993. CT Page 6588
On March 9, 1993, Gem-CT applied for chapter 7 bankruptcy. The final decree was issued on November 3, 1993. The bankruptcy filings for Gem-CT did not include Gem-Utah (Alydaar) stock as an asset of Gem-CT.
In November of 1993, Gruder's home in Connecticut was foreclosed and he moved to North Carolina with two additional employees who had come from Canada. In September of 1993, the computer disks constituting the ADA compiler information was turned over by Gruder to the plaintiffs as provided for in the security agreement contained in the note purchase agreements. According to Gruder, the disks contained nothing of value.
Alydaar became successful with respect to Y2K problems, which did not involve technology developed for the ADA compiler, despite the government filings which indicated that Alydaar had begun development of the project in 1989. Gruder has sold various shares of Alydaar stock and at least as of January, 1994, utilization of the word "trustee" appears on the documents. However, by March of 1994, the word trustee was no longer employed.
Immediately upon acquiring the stock of Enertronix as trustee, Gruder changed the name of that company so that there were then two companies with the same name: one a public company incorporated under the laws of the State of Utah (Gem-Utah) and the other a private company incorporated under the laws of the State of Connecticut (Gem-CT). Gruder then advised the plaintiffs and others that shares in the public company were available on the open market via the pink sheets despite the fact that the public company had no assets, no stock book, and was engaged in no business activity. Thereafter, Gruder knowingly, and with intent to deceive, made numerous misstatements to the plaintiffs with respect to the relationship between Gem-CT and Gem-Utah. In the various government filings with respect to Alydaar, Gruder continued to refer to one company or the other as an "affiliate" or a "subsidiary" and sometimes represented that he acquired the stock as compensation and sometimes for assets. At all times Gruder knew that the only relationship between Gem-CT and Gem-Utah (Alydaar) was the fact that he was involved with both companies and had access to the Gem-Utah stock as trustee. When the final decree in the bankruptcy of Gem-CT was issued in November of 1993, Gruder had not told the plaintiffs or anyone else that there was no legal relationship between Gem-CT and CT Page 6589 Gem-Utah. Nor had he disclosed to anyone the fact that he was treating the "trustee" stock in Gem-Utah (Alydaar) as his own property and that he was utilizing it for his own purposes.
The plaintiffs first became aware that there was a company called Alydaar as a result of a telephone call made to Gruder in August or September of 1992, and the phone was answered as Alydaar Software. The plaintiffs did not have knowledge at that time of the stock transactions conducted by Gruder.
In July of 1996, the plaintiffs instituted the present action. Two central issues govern the claims (hereinafter specifically discussed) asserted by the plaintiffs. One issue is whether the plaintiffs are asserting claims for wrongs committed against Gem-CT or whether the plaintiffs are asserting claims for wrongs committed against them which directly affect them as Gem-CT noteholders. The second issue is whether, because of the bankruptcy, the plaintiffs have standing to assert their claims.
 STANDING
"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." Lawrence Brunoli, Inc. v. Town of Branford,247 Conn. 407, 411, 722 A.2d 271 (1999). "Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . Thus, standing does not hinge on whether the plaintiff will ultimately be entitled to obtain relief on the merits of an action, but on whether he is entitled to seek the relief. . . ." Lewis v. Swan, 49 Conn. App. 669, 675,716 A.2d 127 (1998).
A. Direct vs. Derivative Standing
"`Since at least the middle of the 19th century, it has been accepted in this country that the law should permit shareholders to sue derivatively on their corporation's behalf under CT Page 6590 appropriate conditions.' 2 American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) c. 1, p. 4, introductory note. `[I]t is axiomatic that a claim of injury, the basis of which is a wrong to the corporation, must be brought in a derivative suit, with the plaintiff proceeding "secondarily," deriving his rights from the corporation which is alleged to have been wronged.' Yanow v. Teal Industries, Inc.,178 Conn. 262, 281, 422 A.2d 311 (1979). Derivative actions are governed by § 52-572j. Under § 52-572j, a shareholder who believes that the corporation has been harmed by the actions of corporate officers, directors, or third parties may bring suit on behalf of the corporation, should the corporation fail to do so itself. In contrast, in order for a shareholder to bring a direct or personal action against the corporation or other shareholders, that shareholder must show an injury that is separate and distinct from that suffered by any other shareholder or by the corporation. Yanow v. Teal Industries, Inc., supra,178 Conn. 282; see also In Re Ionosphere Clubs, Inc., 17 F.3d 600, 605 (2d Cir. 1994) (`[t]he distinction between derivative and direct claims turns primarily on whether the breach of duty is to the corporation or to the shareholder[s] and whether it is the corporation or the shareholder[s] that should appropriately (receive relief')." Fink v. Golenbock, 238 Conn. 183, 200-01,680 A.2d 1243 (1996).
Pursuant to General Statutes § 52-572j(a): "Whenever any corporation or any unincorporated association fails to enforce a right which may properly be asserted by it, a derivative action may be brought by one or more shareholders or members to enforce the right, provided the shareholder or member was a shareholder or member at the time of the transaction of which he complained or his membership thereafter devolved on him by operation of law. . . . The derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of the shareholders or members similarly situated in enforcing the right of the corporation or association."
Regardless of whether Gem-CT failed to enforce its rights, the plaintiffs may not do so for the corporation because as holders of convertible debentures which were not converted at the time suit was commenced, they are not "shareholders." "A debenture is a credit instrument which does not devolve upon its holder an equity interest in the issuing corporation." Simons v.Cogan, 549 A.2d 300, 303 (Del.Supr. 1988). "Similarly, the CT Page 6591 convertibility feature of the debenture does not impart an equity element until conversion occurs." Id. "In sum, a convertible debenture represents a contractual entitlement to the repayment of a debt and does not represent an equitable interest in the issuing corporation necessary for the imposition of a trust relationship with concomitant fiduciary duties." Id. Thus, "[u]ntil the debenture is converted into stock the convertible debenture holder acquires no equitable interest, and remains a creditor of the corporation whose interests are protected by the contractual terms of the indenture." Id., 304. The obligations of indenture trustee are circumscribed by the terms of the indenture. The trustee's duties are defined by contract, and the trustee owes debenture holders no fiduciary duties beyond those provided by the indenture. Lorenz v. CSX Corp. , 736 F. Sup. 650,656 (W.D.Pa. 1990), aff'd, 1 F.3d 1406, 1417 (3rd Cir. 1993). See also Powers v. British Vita, P.L.C., 969 F. Sup. 4, 5 (S.D.N Y 1997) (applying Delaware law and noting that an option to buy stock in futuro does not make one an equitable stockholder). Thus, the plaintiffs do not have standing to raise claims on behalf of Gem-CT as corporate shareholders, due to the fact that they never exercised their option to convert the notes into shares of stock.
 B. Standing of the Bankruptcy Trustee
The filing of a bankruptcy petition immediately alters the rights of the corporation and the manner in which its rights may be asserted. Mitchell Excavators By Mitchell v. Mitchell,734 F.2d 129, 131 (2nd Cir. 1984). "The initial inquiry . . . is whether a claim . . . constitutes `property' of the bankruptcy estate or debtor-in-possession within the scope of Bankruptcy Code § 541(a). 11 U.S.C. § 541 (1988). Property of the estate does not belong to any individual creditor." Kalb, Voorhis Co.v. American Financial Corp. , 8 F.3d 130, 132 (2nd Cir. 1993). In a chapter 7 case, "[t]he trustee in bankruptcy has a duty to collect and liquidate all nonexempt property from the bankrupt's estate. 11 U.S.C. § 704 (1988). The bankruptcy estate encompasses `all legal or equitable interests of the debtor in property as of the commencement of the case' . . . including any causes of action possessed by the debtor. . . ." (Citation omitted.) Sewardv. Devine, 888 F.2d 957, 963 (2nd Cir. 1989). "If a cause of action alleges only indirect harm to a creditor (i.e., an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate." Matter ofCT Page 6592Educators Group Health Trust, 25 F.3d 1281, 1284 (5th Cir. 1994). "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." Id. "A cause of action to redress wrongs inflicted upon the debtor is property of the estate which is protected by the automatic stay. Thus, for example, any attempt by shareholders to exercise derivatively those rights which belong exclusively to a corporate debtor would violate the stay." Bankruptcy Service, Lawyer's Edition 5A: Maintaining the Status Quo; Automatic Stay, § 5A:51 (1998). See also 11 U.S.C § 362, Automatic Stay.
 Count One: Fraud By Gruder, Dudchik, Gem-CT
The plaintiffs' fraud claims are based on statements made by Gruder concerning the nature of the relationship between Gem-CT or Gem-Utah. The fraud claims are based on specific conduct that affected only the rights of the plaintiff noteholders, as a particular class of investors. Furthermore, the fraud claims raised by the plaintiffs do not constitute claims which belonged to Gem-CT at the time Gem-CT filed for bankruptcy.
 Count 2: Breach of Fiduciary Duty
The plaintiffs claim that Gruder, Dudchik and Gem-CT had a duty (1) to protect their investment; (2) to protect and preserve the assets of the corporation; (3) not to divert the investment for their own use; and (4) not to divert business opportunities from Gem-CT.
No claim of a breach of fiduciary duty can be maintained by the plaintiffs here, because Gruder owed no fiduciary duty to the plaintiffs, whose status is that of a mere noteholder rather than a shareholder. Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., supra, 716 F. Sup. 1524.
 Count 3: Breach of Fiduciary Duty by Gruder Under Trust Agreement
The plaintiffs allege that Gruder breached his obligation under an express trust by converting Enertronix shares to his own use and to the detriment and financial damage of Gem-CT and its investors and shareholders. CT Page 6593
To the extent this claim alleges a cause of action on behalf of Gem-CT and its shareholders, it is derivative in nature and cannot be maintained by the plaintiffs as corporate creditors. In addition, the investment money was an asset of Gem-CT and the accounting for these monies affects all Gem-CT shareholders and creditors.
 Count 4: Imposition of Constructive Trust/Gruder
"`A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' See 5 Scott, Trusts (3d Ed.) § 462, p. 3413. The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment. . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. . . . One holding title to property upon which a constructive trust is imposed is not compelled to reconvey the property because he is a constructive trustee; it is because he can be compelled to convey title to the property that he is a constructive trustee." Schmaling v. Schmaling,48 Conn. App. 1, 18, 707 A.2d 339, cert. denied, 244 Conn. 929,711 A.2d 727 (1998).
Although Gruder utilized the plaintiffs' investment funds to acquire the Enertronix public shell as trustee, Gruder simultaneously held the funds as an officer of Gem-CT on behalf of Gem-CT. Therefore, the plaintiffs' investment comprised assets of Gem-CT's bankruptcy estate, and the plaintiffs must look to the bankruptcy trustee to impose a constructive trust and trace the investment assets.
Counts 5 and 6: Instrumentality Rule/Piercing the Corporate Veil
"[I]f, under state law, a cause of action belongs to the debtor or if rights of action exist against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or by shareholders derivatively before bankruptcy, those actions properly are asserted by the bankruptcy trustee." (Internal quotation marks omitted.) St. Paul Fire Marine Ins. Co. v.Pepsico, Inc., 884 F.2d 688, 697 (2nd Cir. 1989), quoting KochCT Page 6594Refining v. Farmers Union Central Exchange, Inc., 831 F.2d 1339,1343 (7th Cir. 1987), cert. denied, 485 U.S. 906,108 S.Ct. 1077, 99 L.Ed.2d (1988). However, where a creditor has been the direct object of an alter ego's actions, and has suffered an immediate and distinct injury, that creditor may maintain an action outside of the bankruptcy proceedings. St. Paul Fire Marine Ins. Co. v. Pepsico, Inc., supra, 884 F.2d 698, citingKoch Refining v. Farmers Union Central Exchange, Inc., supra, 831 F.2d 1353-54. "[W]hether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law." St. Paul Fire Marine Ins.Co. v. Pepsico, Inc., supra, 884 F.2d 700. "It is plain . . . that Congress intended to protect all creditors by making the trustee the proper person to assert claims against the debtor. This reasoning extends to common claims against the debtor's alter ego or others who have misused the debtor's property in some fashion." Id., 701.
Connecticut law recognizes that "[t]he concept of piercing the corporate veil is equitable in nature." Angelo Tomasso, Inc.v. Armor Construction Paving, Inc., 187 Conn. 544, 555,447 A.2d 406 (1982). "No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case." Id., 555-56. "When the statutory privilege of doing business in the corporate form is employed as a cloak for the evasion of obligations, as a mask behind which to do injustice, or invoked to subvert equity, the separate personality of the corporation will be disregarded." DeMartino v. Monroe Little League, Inc.,192 Conn. 271, 275, 471 A.2d 638 (1984). "[A] court will disregard the corporate structure and pierce the corporate veil `only under exceptional, circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) SFA FolioCollections, Inc. v. Bannon, 217 Conn. 220, 230, 585 A.2d 666, cert. denied, 501 U.S. 1223, 111 S.Ct. 2839, 115 L.Ed.2d 1008
(1991). "The corporate veil will be pierced when `the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor.'" United ElectricalContractors, Inc. v. Progress Builders, Inc., 26 Conn. App. 749,755, 603 A.2d 1190 (1992).
Under the instrumentality rule, "proof of three elements is required: (1) Control, not mere majority or complete stock CT Page 6595 control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Internal quotation marks omitted.) United Electrical Contractors, Inc. v. ProgressBuilders, Inc., supra, 26 Conn. App. 755.
No Connecticut case addresses whether a corporation may bring an alter ego action against its own parent. Due to the similarity of Ohio and Connecticut law on this point, however, the analysis set forth in St. Paul Fire Marine Ins. Co. v. Pepsico, Inc., supra, is persuasive.[1] Therefore, the court adopts the conclusion of the St. Paul court that alter ego claims do exist between a parent and subsidiary, and therefore such a cause of action becomes the property of the bankruptcy estate. Id., 703-04. Accordingly, the plaintiffs' claims to pierce the corporate veil in counts five and six are claims which must be brought by the bankruptcy trustee.
 Counts Seven; Eight; Nine: Declaratory Judgment
To the extent the plaintiffs have failed to prove their causes of action for declaratory judgments, there is no need to address whether the claims belong to the bankruptcy estate.[2]
 Count Ten: Breach of Contract
The plaintiffs allege that Gruder, Dudchik and Gem-CT failed to accept their tender of the notes. A preliminary question concerns whether the notes themselves constitute executory contracts which can be assumed or rejected by the bankruptcy trustee. 11 U.S.C § 365(a) provides that "the trustee, subject to the court's approval, may assume or reject any executory contract. . . ." The plaintiffs dispute the defendants' position that the convertible notes are executory contracts which did not survive the bankruptcy. The plaintiffs' position is that convertible notes are not executory, relying on an unreported case from the Minnesota Bankruptcy Court, In re CPT Corp. 
(Bkrtcy.D.Minn. 1992).[3] The reported cases cited by the CT Page 6596 defendants, which constitute appropriate precedent for this court to rely upon, stand for the proposition that convertible notes are executory contracts. See In re Riodizio, Inc., 204 B.R. 417,424 (Bkrtcy S.D.N.Y. 1997) (option agreement for shareholders held to be executory); In re West Chestnut Realty of Haverford,Inc., 177 B.R. 501, 504 (Bkrtcy E.D.Pa. 1995) (stock option agreements are generally executory).[4]
The convertible notes at issue are executory contracts. "Where an executory contract is silent as to the time of performance, a tender must be made within a reasonable time." 86 C.J.S. Tender § 13. Here, the plaintiffs, with knowledge that Gem-CT had gone into bankruptcy in 1993, waited until 1996 to first tender back the notes. The court finds that the plaintiffs' offer of tender was not made within a reasonable time. Therefore, the plaintiffs cannot show that Gruder wrongfully refused to accept their tender of the notes.
 Count Eleven: Mandatory Injunction/Gruder/Dudchik/Alydaar
The plaintiffs seek to have elected to the board of Alydaar a representative of their choosing. Such a claim against Alydaar derives, however, from claims made against Gem-CT and therefore constitutes a claim properly addressed by the bankruptcy trustee.
 Count Twelve: Breach of Employment Contract/Gruder/Gem-CT
"A contract is executory if the obligations of both the bankrupt and the other party to the contract are so far unperformed [at the time of filing] that the failure of either to complete performance would constitute a material breach excusing performance of the other." (Internal quotation marks omitted.) Inre Bryant Universal Roofing, Inc., 218 B.R. 948, 953 (Bkrtcy. D.Ariz. 1998). "The significant date for determining whether a contract is executory is initially at the time when the bankruptcy petition was filed." In re Spectrum InformationTechnologies, Inc., 190 B.R. 741, 747 (Bkrtcy.E.D.N.Y. 1996). "The question is whether the remaining obligations rise to the level of material future performance." In re Bryant UniversalRoofing, Inc., supra, 218 B.R. 953. "Generally, where the only performance obligation remaining under the employment contract is the payment of money, the contract will not be found executory." Id. "An agreement to refrain from action, however, may be considered executory. Fenix Cattle Co. V. Silver (In reSelect-A-Seat Corp. ), 625 F.2d 290, 292 (9th Cir. 1980) CT Page 6597 (agreement promising to refrain from selling product to others is executory)." Id., 953-54.
The employment agreement here is an executory contract pursuant to 11 U.S.C. § 365. At the time Gem-CT filed for bankruptcy, Gruder had not materially performed his obligations under the employment contract. The uncontroverted evidence at trial was that the ADA compiler has never been completed. Furthermore, Gruder was not discharged by Gem-CT or in any other way relieved of his obligations under the employment contract before Gem-CT filed for bankruptcy. Accordingly, whether the contract could be enforced was a matter for the bankruptcy trustee to decide.
 Counts Thirteen and Fourteen: CUTPA
The plaintiffs' CUTPA claims are derived from the fraud claims, which are direct in nature and advance claims which specifically effect the plaintiffs as noteholders of Gem-CT. Therefore, the plaintiffs may maintain their claims under CUTPA.
 REMAINING THEORIES OF RECOVERY Fraud — Statute of Limitations
The applicable statute of limitations for causes of action of fraud is controlled by General Statutes § 52-577, which has a three year statute of limitations. Claims for fraudulent misrepresentation have been included under this statute. SeeArrigoni v. Adorno, 129 Conn. 674 (1943); Wedig v. Brinster,1 Conn. App. 123 (1983), cert. denied 192 Conn. 803 (1984). General Statutes § 52-577 provides: "No action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."
The court finds that the plaintiffs' claims have been brought within the three year statute of limitations provided for in §52-577. "[I]n order [t]o support a finding of a continuing course of conduct that may toll the statute of limitations there must be evidence of the breach of a duty that remained in existence after commission of the original wrong related thereto. That duty must not have terminated prior to commencement of the period allowed for bringing an action for such a wrong. . . . Where [the Connecticut Supreme Court has] upheld a finding that a duty continued to exist after the cessation of the act or omission CT Page 6598 relied upon, there has been evidence of either a special relationship between the parties giving rise to such a continuing duty or some later wrongful conduct of a defendant related to the prior act." (Internal quotation marks omitted.) Blanchette v.Barrett, 229 Conn. 256, 275, 640 A.2d 74 (1994). "The continuing course of conduct doctrine reflects the policy that, during an ongoing relationship, lawsuits are premature because specific tortious acts or omissions may be difficult to identify and may yet be remedied." Id., 276. "The court seems to say that it is fair to have the `continuous course of conduct rule' operate where there is a fiduciary relationship or relationship between two parties so that one of the parties has an ongoing responsibility to right any wrongs he or she may have done or bring them to the injured party's attention — the latter party relying on the relationship of trust might very well not be as attentive to protecting his or her interests, thus the rigor of the limitations statutes should be relaxed." Lestrange v.Kontout, Superior Court, judicial district of Ansonia/Milford at Milford, Docket No. 046929 (November 4, 1997, Corradino, J.).
A portion of the funds invested by the plaintiffs in 1989 was used to purchase a public shell, Gem-Utah. From 1989 to the time of Gem-CT's bankruptcy dissolution on November 3, 1993, Gruder made numerous conflicting statements to the plaintiffs and others with respect to the relationship between Gem-CT and Gem-Utah. Therefore, although the first instances of fraud occurred beyond the three year statute of limitations, Gruder participated in a continuing course of conduct through which he made fraudulent misrepresentations concerning the corporate structure of Gem-CT. Accordingly, the plaintiffs' institution of the present action in July of 1996 falls within three years from the last instance of fraudulent conduct on the part of Gruder, and therefore the claims are not barred by the three year statute of limitations.
 Fraudulent Misrepresentation
"The essential elements of a cause of action in fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon it; and (4) the other party did so act upon the false representation to his injury. . . . All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery. . . . Additionally, [t]he party asserting such a cause of action must prove the existence of the first three of [the] elements by a CT Page 6599 standard higher than the usual fair preponderance of the evidence, which higher standard we have described as `clear and satisfactory' or `clear, precise and unequivocal.'" (Citations omitted; internal quotation marks omitted.) Citino v.Redevelopment Agency, 51 Conn. App. 262, 275-76, 721 A.2d 1197
(1998). "Fraud is not to be presumed, but must be strictly proven." Connell v. Colwell, 214 Conn. 242, 252, 571 A.2d 116
(1990).
The facts adduced at trial show that Gruder knew of the relationship between Gem-CT and Gem-Utah, and manipulated the structure of that relationship to suit his own purposes, to the detriment of the plaintiffs. Therefore, the plaintiffs have proved their claims in count one.
 Counts Thirteen and Fourteen: CUTPA Statute of Limitations
"Since CUTPA violations are defined in General Statutes §42-110b to include `deceptive acts or practices in the conduct of any trade or commerce,' it is evident that the legislature intended that the perpetrators of such fraudulent practices, as well as other CUTPA violators, should be permitted to avail themselves of the statute of limitations defense provided by §42-110g(f). Despite the existence in other states of statutes of limitation applicable to unfair trade practices establishing a limitation period for bringing an action that begins after discovery of the violation, our legislature has failed to create such an option for victims of CUTPA violations in this state. . . . Therefore, if the deceptive acts that the [trier of fact] reasonably could have found form the basis of the CUTPA claim occurred more than three years prior to the commencement of the action, that claim is time barred." (Citation omitted.)Willow Springs Condominium Association, Inc. v. 7th BRTDevelopment Corp. , 245 Conn. 1, 45-46, 717 A.2d 77 (1998).
The deceptive acts and practices which form the basis for the plaintiffs' CUTPA claims occurred within three years from the time the plaintiffs instituted this action. Accordingly, the plaintiffs' CUTPA claim has been brought within the three year statute of limitation provided for in § 42-110g(f).
 Elements of CUTPA
"[I]n determining whether a practice violates CUTPA we have CT Page 6600 adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise — whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. Thames River Recycling, Inc. v. Gallo,50 Conn. App. 767, 785-86, 720 A.2d 242 (1998). "A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy. . . . Furthermore, a party need not prove an intent to deceive to prevail under CUTPA." Id., 786.
"While CUTPA damages need not be proven with absolute precision, the failure to present any evidence concerning the nature and extent of the injury sustained precludes recovery under the statute." A. Secondino Son, Inc. v. LoRicco,215 Conn. 336, 344, 576 A.2d 464 (1990). "An ascertainable loss is a deprivation, detriment [or] injury that is capable of being discovered, observed or established. . . . [A] loss is ascertainable if it is measurable even though the precise amount of the loss is not known. . . . Under CUTPA, there is no need to allege or prove the amount of the ascertainable loss. . . . A plaintiff need not prove a specific amount of actual damages in order to make out a prima facie case [under CUTPA]." (Citations omitted.) Kim v. Magnotta, 49 Conn. App. 203, 212, 714 A.2d 38, cert. granted, 247 Conn. 905, 720 A.2d 514 (1998).
The plaintiffs have demonstrated that the acts of Gruder were deceptive and caused the plaintiffs substantial injury, including the value of the plaintiffs' investment.
The court finds that the plaintiffs are entitled to damages against Gruder in the amount of $175,000 plus interest pursuant to General Statutes § 37-3a at the rate of ten per cent per year from October 9, 1989 (the date when Gruder first took the stock of Enertronix as trustee and changed the name of that company) to the date of judgment. The court further finds that the plaintiffs CT Page 6601 are entitled to attorneys' fees pursuant to General Statutes §42-110g(d).
On June 1, 1999, at 2:00 p. m., in courtroom 6D, the court will hold a non-evidentiary hearing for the purpose of determining the scope of any discovery necessary for the determination of the attorneys' fee issue and to schedule a date for an evidentiary hearing on that issue. The entry of judgment will be withheld until the determination of the attorneys' fee issue and at that time judgment will enter against the defendant Gruder and in favor of the remaining defendants.
RUSH, J.